O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **JAMIE RODRIGUEZ SANDOVAL,** | ) | **NO. EDCV 13-01019-MAN** |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **v.** | ) | |
| | ) | **AND ORDER** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

On June 18, 2013, plaintiff filed a Complaint seeking review of the denial of her application for disability and disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI"). (ECF No. 4.)  On August 7, 2013, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge.  (ECF No. 10.)  On April 3, 2014, the parties filed an amended Joint Stipulation, in which plaintiff seeks an order reversing the Commissioner's decision and remanding this case for the payment of benefits or, alternatively, for further administrative proceedings; and the Commissioner requests that her decision be affirmed or, alternatively, remanded for further administrative proceedings.  (ECF No. 17 at 20-21.)  The Court has taken the parties' Joint Stipulation under submission without oral argument.

1

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

2

3        On June 30, 2009, plaintiff filed her applications for DIB and SSI.  (Administrative Record

4 ("A.R.") 218-23.)  Plaintiff, who was born on May 26, 1962 (*id.* 218),[1] claims to have been

5 disabled since January 3, 2008, due to:  bipolar disorder; post-traumatic stress disorder; panic;

6 anxiety; mood swings; asthma; and migraines (*id.* 240).   Plaintiff has past relevant work

7 experience as a receptionist and warehouse laborer.  (*Id.* 24.)

8

9        After the Commissioner denied plaintiff's claim initially and upon reconsideration, plaintiff

10 requested a hearing.  (A.R. 102, 134.)  On February 1, 2011, plaintiff, who was represented by

11 counsel, appeared and testified at a hearing before Administrative Law Judge ("ALJ") Sharilyn

12 Hopson.  (*Id.* 102-11.)  On February 8, 2011, ALJ Hopson issued an unfavorable decision.  (*Id.*

13 111.)  On March 2, 2012, the Appeals Council granted plaintiff's request for review and remanded

14 for consideration of new and material evidence from plaintiff's treating psychiatrist, Imelda

15 Alfonso, M.D.  (*Id.* 116-17.)  Specifically, the Appeals Council wrote that plaintiff's newly submitted

16 evidence, an April 6, 2011 Mental Impairment Questionnaire completed by Dr. Alfonso, needed

17 to be evaluated by the ALJ, because it "offers a longitudinal perspective on limitations that

18 [plaintiff] may have experienced before the hearing decision was issued." (*Id.* 116.)  Accordingly,

19 the Appeals Council ordered the ALJ, on remand, to update the evidence on plaintiff's condition

20 and *inter alia*:  "[g]ive further consideration to plaintiff's maximum residual functional capacity

21 during the entire period at issue"; "provide rationale with specific references to evidence of record

22 in support of assessed limitations"; and "evaluate the treating source opinion of Dr. Alfonso, dated

23 April 6, 2011." (*Id.*)

24

25

26

27        [1]   On the alleged disability onset date, plaintiff was 45 years old, which is defined as a younger individual.  (A.R. 24 (citing 20 C.F.R. §§ 404.1563, 416.963).)  As noted by the ALJ, plaintiff subsequently changed age category to the closely approaching advanced age category.

28 (*Id.* 24.)

On December 6, 2012, a hearing was held before a new ALJ, Paul Coulter.  (A.R. 15.) Plaintiff, who was represented by counsel, appeared and testified.  (*Id.* 15-26.)  Medical Expert ("ME") Joseph Malancharuvil, PhD, a board certified clinical psychologist, and Vocational Expert ("VE") Corinne J. Potter also testified.  (*Id.* 15, 65-71, 87-92.)  On December 21, 2012, ALJ Coulter ("the ALJ") denied plaintiff's claim (*id.* 15-26), and the Appeals Council subsequently denied plaintiff's request for review of the ALJ's decision (*id.* 1-6).  That decision is now at issue in this action.

## SUMMARY OF ADMINISTRATIVE DECISION

In his December 21, 2012 decision, the ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2012.  (A.R. 17.)  He determined that from January 3, 2008, through the date of the decision, plaintiff had not engaged in substantial gainful activity.  (*Id.*)  The ALJ further determined that plaintiff has the following severe impairments:  bipolar disorder; panic disorder; post-traumatic stress disorder ("PTSD"); anxiety; mood swings; history of asthma; and migraines.  (*Id.*)  The ALJ concluded that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1, including affective disorder (listing 12.04) and anxiety-related disorder (listing 12.06).  (*Id.* 18.)

After reviewing the record, the ALJ found that plaintiff has the residual functional capacity ("RFC") to perform light work as follows:  lift, carry, push, or pull 20 pounds occasionally and ten pounds frequently; stand and/or walk for about six hours of an eight-hour workday; sit for about six hours of an eight-hour workday; avoid concentrated exposure to extreme cold, extreme heat, irritants (such as fumes, odors, dust, and gases), and hazards (such as dangerous machinery and heights); precluded from tasks requiring plaintiff to be in charge of the safety of others; cannot perform jobs requiring hypervigilant activities; limited to simple and repetitive tasks; cannot perform highly fast-paced work; and can handle only occasional changes in the work setting.

1   (A.R. 19.)  In making these findings, the ALJ considered the medical evidence and opinions of

2   record and the subjective symptom testimony of plaintiff.  (*Id.* 19-20.)  However, in assessing

3   plaintiff's functional limitations due to her mental impairments, the ALJ accorded little weight to

4   the opinion of plaintiff's treating psychiatrist, Dr. Alfonso (*id.* 23), and relied heavily on the

5   opinions of the ME, Dr. Malancharuvil, and the consultative psychiatric examiner, Ernest Bagner

6   III, MD, to support his nondisability determination (*id.* 21-24.)

7

8       Based on plaintiff's age, education,[2] work experience, and RFC, as well as the testimony

9   of the VE, the ALJ concluded that "there are jobs that exist in significant numbers in the national

10  economy that [plaintiff] can perform," including the jobs of routing clerk; non-governmental mail

11  clerk; and ticketer.  (A.R. 25.)  Thus, the ALJ held that plaintiff has not been under a disability,

12  as defined in the Social Security Act, since January 3, 2008, the alleged onset date of her

13  disability, through December 21, 2012, the date of the ALJ's decision.  (*Id.* 26.)

14

15                                      **STANDARD OF REVIEW**

16

17      Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine

18  whether it is free from legal error and supported by substantial evidence in the record as a whole.

19  Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007).  Substantial evidence is "'such relevant evidence

20  as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (citation omitted).

21  The "evidence must be more than a mere scintilla but not necessarily a preponderance."  Connett

22  v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003).  "While inferences from the record can constitute

23  substantial evidence, only those 'reasonably drawn from the record' will suffice."  Widmark v.

24  Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted).

25

26      Although this Court cannot substitute its discretion for that of the Commissioner, the Court

27  _____

28      [2]  The ALJ determined that plaintiff "has at least a high school education and is able to
    communicate in English."  (A.R. 25.)

4

1  nonetheless must review the record as a whole, "weighing both the evidence that supports and
2  the evidence that detracts from the [Commissioner's] conclusion." Desrosiers v. Sec'y of Health
3  and Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988); see also Jones v. Heckler, 760 F.2d 993, 995
4  (9th Cir. 1985).  "The ALJ is responsible for determining credibility, resolving conflicts in medical
5  testimony, and for resolving ambiguities."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir.
6  1995).

7

8      The Court will uphold the Commissioner's decision when the evidence is susceptible to
9  more than one rational interpretation.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).
10 However, the Court may review only the reasons stated by the ALJ in his decision "and may not
11 affirm the ALJ on a ground upon which he did not rely." Orn, 495 F.3d at 630; see also Connett,
12 340 F.3d at 874.  The Court will not reverse the Commissioner's decision if it is based on harmless
13 error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential
14 to the ultimate nondisability determination.'" Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th
15 Cir. 2006) (quoting Stout v. Comm'r, 454 F.3d 1050, 1055 (9th Cir. 2006)); see also Burch, 400
16 F.3d at 679.

17

18                                    **DISCUSSION**

19

20      Plaintiff alleges the ALJ erred by according greater weight to the opinions of the ME, Dr.
21 Malancharuvil, and the consultative examiner, Dr. Bagner, than to the opinions of her treating
22 psychiatrist, Dr. Alfonso.  (Joint Stip. at 4.)  An ALJ is obligated to take into account all medical
23 opinions of record.  20 C.F.R. §§ 404.1527(c), 416.927(c).  It is the responsibility of the ALJ to
24 resolve conflicts in medical testimony and analyze evidence. Magallanes v. Bowen, 881 F.2d 747,
25 750 (9th Cir. 1989).  In the hierarchy of physician opinions considered in assessing a social
26 security claim, the opinion of a treating physician is entitled to greater weight than that of an
27 examining physician, the opinion of an examining physician is entitled to greater weight than that
28 of a non-examining physician, and the weight afforded a non-examining physician's testimony

                                            5

1    depends on the degree to which he provided supporting explanations for his opinions.  Garrison

2    v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194,

3    1198 (9th Cir. 2008)); see also 20 C.F.R. §§ 404.1527(c), 416.927(c).

4

5    The opinions of treating physicians are entitled to the greatest weight, because the treating

6    physician is hired to cure and has a better opportunity to know and observe the claimant.

7    Magallanes, 881 F.2d at 751.  When a treating physician's opinion is not contradicted by another

8    physician, it may be rejected only for "clear and convincing" reasons.  Ghanim v. Colvin, 763 F.3d

9    1154, 1160-61 (9th Cir. 2014); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  When, as here,

10   it is contradicted by another doctor, a treating physician's opinion may only be rejected if the ALJ

11   provides "specific and legitimate" reasons supported by substantial evidence in the record.

12   Ghanim, 763 F.3d at 1161; Garrison, 759 F.3d at 1012; see also Ryan, 528 F.3d at 1198.

13

14   "The opinion of a nonexamining physician cannot by itself constitute substantial evidence

15   that justifies the rejection of the opinion of . . . a treating physician."  Lester, 81 F.3d at 831; see

16   Pitzer v. Sullivan, 908 F.2d 502, 506 n.4 (9th Cir. 1990) (finding that the nonexamining physician's

17   opinion "with nothing more" did not constitute substantial evidence).  However, "[w]here the

18   opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating

19   source is based on independent clinical findings that differ from those of the treating physician,

20   the opinion of the nontreating source may itself be substantial evidence."  Andrews, 53 F.3d at

21   1041.  Independent clinical findings include "(1) diagnoses that differ from those offered by

22   another physician and that are supported by substantial evidence, or (2) findings based on

23   objective medical tests that the treating physician has not herself considered."  Orn, 495 F.3d at

24   632 (internal citations omitted).

25

26   Here, the ALJ accorded "significant weight" to the opinions of the consultative psychiatric

27   examiner, Dr. Bagner, and the medical expert who reviewed plaintiff's records, Dr. Malancharuvil,

28   and accorded "little weight" to the opinion of plaintiff's treating psychiatrist, Dr. Alfonso.  (A.R.

23.)  For the reasons stated below, the Court finds that the ALJ improperly evaluated these medical opinions.

## I.   The Medical Opinions At Issue

### A.   Dr. Alfonso's Opinions

The Appeals Council ordered the ALJ, on remand, to evaluate the opinion of plaintiff's treating psychiatrist, Dr. Alfonso, as reflected in an April 6, 2011 Mental Impairment Questionnaire, in accordance with the social security regulations and rulings. (A.R. 116-17.)  The Appeals Council described Dr. Alfonso's April 6, 2011 opinion as "material" evidence that "offers a longitudinal perspective" on plaintiff's limitations, and as such, the Appeals Council concluded that it was "necessary to evaluate" that opinion to determine properly whether or not plaintiff is disabled.  (*Id.* 116.)

Following the Appeals Council's decision, Dr. Alfonso submitted a second Mental Impairment Questionnaire, dated September 6, 2012, for the ALJ's consideration.  (*See* A.R. 522-25.)  In both her April 2011 and September 2012 questionnaires, Dr. Alfonso stated that she had been seeing plaintiff every two months for approximately 30 minute sessions (*id.* 443, 522), and she opined that plaintiff would have difficulty working on a sustained basis (*id.* 444, 525).  Dr. Alfonso explained that plaintiff suffers from depression (*id.* 444, 525), mood swings (*id.*), and "severely impaired concentration" (*id.* 525).  Dr. Alfonso stated that, due to these impairments, plaintiff experiences:  marked limitations in activities of daily living and maintaining social functioning; constant deficiencies in concentration, persistence, or pace that result in a failure to complete tasks in a timely manner; and repeated episodes of "deterioration or decompensation in work or work-like settings" that cause her to withdraw from the situation or to experience exacerbation of signs and symptoms." (*Id.* 444, 525.)  Dr. Alfonso also provided the records of her two year treating relationship with plaintiff.

1    The ALJ gave little weight to Dr. Alfonso's opinions and provided four reasons for his

2  determination that the opinions of Drs. Bagner and Malancharuvil were entitled to greater weight

3  than the opinions of Dr. Alfonso. (*See* A.R. 22-23.) First, he found Dr. Alfonso's assessment that

4  plaintiff has "marked mental limitations" to be inconsistent with the objective medical evidence

5  as a whole, which he characterized as showing plaintiff's previous mental status examinations to

6  be within normal limits or reflecting only mild limitations. (*Id.* 23 (citing *id.* 326-46, 347-61, 398,

7  420-41.) Second, he inferred that, because Dr. Alfonso saw plaintiff only once every eight weeks,

8  plaintiff's impairments were not severe enough to warrant more frequent psychiatric care. (*See*

9  *id.*) Third, the ALJ found that Dr. Alfonso's assessment of plaintiff's functional limitations was

10  inconsistent with plaintiff's daily activities, which included "maintaining her personal care,"

11  watching television, reading, helping with dishes, doing her laundry, sitting in the backyard, and

12  playing with her grandson. (*Id.* (citing *id.* at 20).) Fourth, the ALJ found that Dr. Alfonso's own

13  treatment records indicated that plaintiff had been improving with medications. (*Id.*)   As

14  explained in greater detail below, the ALJ's reasons for according little weight to Dr. Alfonso's

15  opinions are not specific and legitimate reasons supported by substantial evidence.

16

17    **B.    Dr. Bagner's Opinion**

18

19    The ALJ accorded "significant weight" to the opinion of Dr. Bagner, who completed a

20  consultative psychiatric examination of plaintiff on August 26, 2009, over three years before the

21  ALJ issued his decision in this case. (A.R. 23; *see also id.* 368-71.) Dr. Bagner diagnosed plaintiff

22  with a mood disorder, not otherwise specified, and polysubstance abuse in remission. (*Id.* 370.)

23  He assessed plaintiff as having a GAF score of 60, denoting moderate symptoms or moderate

24  difficulty in social, occupational, or school functioning. (*Id.*) Dr. Bagner noted that plaintiff has

25  "a history of mood swings and anxiety symptoms . . . and takes psychiatric medications with

26  minimal improvement." (*Id.* 371 (emphasis added).)   He noted plaintiff's "difficulty with

27  concentration and memory[,] . . . problems sleeping and diminished interest in doing daily

28  activities." (*Id.*) He determined that plaintiff would have mild limitations completing simple tasks,

8

1   mild to moderate limitations interacting with supervisors, peers, and the public;[3] and mild to

2   moderate mental limitations handling normal stresses at work, maintaining concentration and

3   attention, completing tasks, and completing a normal work week.  (*Id.* 23-24.)

4

5   Dr. Bagner based his opinion on his examination of plaintiff, plaintiff's statements to him,

6   and his review of "[t]he Department of Corrections dated 2/17/09 [sic]." (A.R. 368.)  Dr. Bagner

7   neglected to identify what type of documents dated 2/17/09 he reviewed, but the only CDCR

8   documents with that date in the record are: (1) a virtually illegible note from a staff psychiatrist,

9   describing plaintiff's complaints of a sudden anxiety attack, racing heart, and other symptoms,

10  assessing plaintiff with a GAF score of 55, and noting plaintiff's diagnoses of panic disorder

11  without agoraphobia, history of substance dependance in full remission, and bipolar disorder (*id.*

12  354); and (2) an even fainter medication monitoring note, which appears to indicate the same

13  symptoms, diagnoses, and GAF score (*id.* 350-51).  Critically, because Dr. Bagner examined

14  plaintiff in August 2009, the later-dated treatment notes of Dr. Alfonso, and other subsequent

15  medical records that longitudinally document plaintiff's mental health impairments, were not

16  available for consideration by Dr. Bagner.

17

18  **B.      Dr. Malancharuvil's Opinion**

19

20  The ALJ also accorded significant weight to the opinion of Dr. Malancharuvil, who never

21  examined plaintiff but testified at the December 6, 2012 hearing before the ALJ that plaintiff had

22  the impairments of: bipolar disorder, depressive type; generalized anxiety disorder; and history

23  of alcohol and substance abuse in remission. (A.R. 66.)  Dr. Malancharuvil assessed plaintiff with

24  mild limitations in activities of daily living, mild to moderate limitations in social functioning, and

25

26

27  _____

28       [3]   The ALJ, without explanation, did not adopt this limitation as part of his RFC
    determination.  (*See infra* note 6.)

9

1    mild to moderate limitations in "perception,[4] persistence, or pace." (*Id.*)  He found that plaintiff

2    had the capability to perform moderately complex tasks[5] but "there should not be a lot of problem

3    solving issues, and there should not be a lot of collaborative adversary (INAUDIBLE) tasks."[6] (*Id.*

4    67-68.)

5

6         Dr. Malancharuvil's testimony was frequently inaudible, making it difficult for the Court to

7    ascertain the basis for his opinions. (*See generally* A.R. 65-71.)  However, in explaining why he

8    disagreed with Dr. Alfonso's assessment of plaintiff's functional limitations, Dr. Malancharuvil

9    suggested that Dr. Alfonso's assessment that plaintiff has marked limitations in daily functions was

10   inconsistent with the frequency of plaintiff's appointments with Dr. Alfonso.  Specifically, Dr.

11   Malancharuvil stated "for somebody with marked limitations like that, they cannot be maintained

12   on medication review once in two months . . . it does not make sense." (A.R. 68.)  However, Dr.

13   Malancharuvil offered no explanation for this opinion. (*See generally id.*)

14

15        Dr. Malancharuvil also cited Dr. Alfonso's December 15, 2011 and March 1, 2012 treatment

16   notes as evidence that plaintiff's condition had improved.  (A.R. 68, 69, 71.)  However, as

17   discussed in greater detail below, both the December 15, 2011 and March 1, 2012 treatment

18   notes indicate that, although plaintiff's medication had decreased the severity of some of her

19

20        [4]  The Court suspects that, because the telephone connection was bad and a portion of Dr.
21   Malancharuvil's statement was inaudible, he actually may have been referring to "concentration,"
     not "perception."

22        [5]  However, when the ALJ "recapped" Dr. Malancharuvil's findings with him, Dr.
23   Malancharuvil agreed with the ALJ that plaintiff should be limited to work that "should not change;
     sort of simple and repetitive tasks." (A.R. 69.)

24        [6]  Despite Dr. Malancharuvil's limitation precluding "collaborative adversary [ ] tasks," as
25   well as Dr. Bagner's finding of mild to moderate limitations interacting with supervisors, peers, and
     the public, the ALJ did not include a limitation relating to plaintiff's interactions with others in the
26   workplace.  (*See* A.R. 91 (explaining to the VE that he specifically did not add no public contact
     to the hypothetical).)  Given plaintiff's severe impairments of bipolar disorder, panic disorder,
27   anxiety, and mood swings, and the "significant" weight the ALJ gave to the opinions of both Drs.
     Malancharuvil and Bagner, the ALJ should have expressly considered these limitations and
28   explained any basis for rejecting them.  Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir.
     1984) (ALJ must provide an explanation when the ALJ rejects "significant probative evidence").

symptoms, plaintiff continued to exhibit depressive symptoms and to experience mood swings and anxiety. (*Id.* 467-68.)  Further, isolated instances of improvement or remission in a plaintiff's mental health must be considered in the context of the plaintiff's "diagnostic picture" as a whole rather than used to infer that the plaintiff's impairments no longer seriously affect her ability to function in a workplace.  *See* Holohan v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001).

## II.     **The ALJ's Reasons For According Little Weight To Dr. Alfonso's Opinions Are Not Specific, Legitimate, And Supported By Substantial Evidence.**

### A.     **The Objective Medical Evidence**

The ALJ's first reason for assigning little weight to Dr. Alfonso's opinion -- and significant weight to the opinions of Drs. Bagner and Malancharuvil -- was that her opinions were inconsistent with the objective medical evidence, namely with reports indicating that "plaintiff's mental status examinations were mild or within normal limits." (A.R. 23.)  The ALJ cited plaintiff's examinations by the California Department of Corrections ("CDCR") and the San Bernadino Department of Behavior Health in support of this statement. (*See id.* 22-23.)  However, the Court's review of these records, and the other objective medical evidence in the record, reveals that, although some aspects of plaintiff's cognition and thought processes are within normal limits, Dr. Alfonso's assessment of the severity of plaintiff's mental impairments and her functional limitations is consistent with the objective medical evidence as a whole.

With respect to the records from the CDCR, a mental status examination conducted on March 2, 2008 indicated that plaintiff's appearance, thought processes, thought content, fund of information, intellectual functioning, attention, memory, and orientation were within normal limits. (A.R. 336.) However, the clinician also observed that plaintiff's mood was anxious, her affect sad, and her sleep poor. (*Id.* 336.)  A second CDCR mental status examination was conducted on May 6, 2008, and similarly showed that plaintiff was within normal limits in a number of areas

(orientation, speech, intellectual functioning, memory, thought processes, insight, judgment), but the clinician also noted that plaintiff exhibited:  "psychomotor retardation," "shaking hands," constricted affect; depressed mood; increased sleeping; and "distracted" attention and concentration."  (*Id.* 331.)  Finally, a CDCR progress note dated December 17, 2008, reported that plaintiff:  described being socially isolated and "down since last year," crying for no reason, and having feelings of hopelessness, anxiousness, and low energy; became tearful at the session; exhibited a depressed mood and constricted affect; stated "I do not care"; and showed signs of dysphoria, interpersonal sensitivity, and depression pointing "to some characterological disorder." (*Id.* 341.)

Notes from mental health treatment sessions during plaintiff's parole period, from November 2008, through August 2009,[7] also indicate that plaintiff experienced anxiety, panic, paranoia, insomnia, inexplicable crying spells, and episodes of crippling depression.  On February 10, 2009, the social worker wrote in a treatment note that plaintiff was "starting to shake, [exhibited] anxiety, couldn't breathe." (A.R. 354.)  On February 17, 2009, plaintiff reported that during the previous week she suffered a "sudden anxiety attack," which was so severe she mistook it for a heart attack and went to the ER.  (*Id.* 350.)  During the attack, her heart raced, and she felt shaky, sweaty, and nervous.  (*Id.*)  At the February 17, 2009 visit, plaintiff also stated "I watch my back" and reported getting irritable, talkative, hyper and having difficult sleeping. (*Id.*)  On April 7, 2009, plaintiff reported alternating between feeling depressed, antsy, and having low energy and being hyper and talkative with racing thoughts.  (*Id.* 353.)  She stated she was "up and down," paranoid that people were following her, and became depressed or happy without reason.  (*Id.*)  On April 29, 2009, plaintiff reported feeling "no good . . . .  I'm up and down.  I'm yelling, I'm annoyed, I'm happy . . . I can't concentrate, I'm sad . . . I feel I'm being backed in the corner."  (*Id.* 352.)  On May 13, 2009, plaintiff appeared looking sweaty and tired with her hair undone.  (*Id.* 352.)  She told the social worker who saw her that "people think and talk about me,

---

[7]  Although many of these documents were very difficult to read because of the faintness of the type, the examples cited were substantially decipherable with effort.

says I'm the one who causes all the trouble . . . [I] feel like I'm going to go nuts ." (*Id.* 352.)  On

May 26, 2009, plaintiff reported feeling anxious, edgy, moody, and "paranoid about people

watching." (*Id.* 349.)  On June 30, 2009, plaintiff reported that she had been depressed for three

days, during which time she:  did not shower; ate only one meal a day; found it hard to get out

of bed; experienced crying spells; felt snappy; and heard noises.  (*Id.* 351.)  The psychiatrist who

saw plaintiff at her June 30, 2009 visit described plaintiff's mood as depressed with restricted

affect, and the social worker who saw plaintiff during that visit described plaintiff as "in some

distress." (*Id.*)

Finally, plaintiff's October 2009 through February 2010 treatment notes from the USC

Medical Center (A.R. 400-19) and her May through December 2010 treatment notes from the San

Bernadino County Department of Behavior Health[8] (*id.* 423-444) also support Dr. Alfonso's

assessment of the severity of plaintiff's mental impairments and her functional limitations.  For

example, during October 5, 2009 visit to the USC Medical Center, plaintiff was assessed with a

GAF score of 51,[9] exhibited an irritable mood and anxious affect, reported hearing people saying

her name, and worried that people are following her and that she will be attacked in her home.

(*Id.* 418-19.)  During a May 24, 2010 visit to the San Bernadino County Department of Behavioral

Health, plaintiff exhibited a sad affect and had "difficulty concentrating/focusing" (*id.* 437), and

she stated that she was suffering from crying spells, depression, self-isolation, feelings of

hopelessness and helplessness, anxiety, panic attacks, and a decreased appetite (*id.* 435-36).  On

June 15, 2010, plaintiff was tearful and exhibited an "anxious mood." (*Id.* 430.)  She reported

feeling "constantly scared." (*Id.*)  On July 22, 2010, plaintiff exhibited a "depressed, irritated"

---

[8]  The treatment notes from the San Bernadino County Department of Behavior Health include, but are not limited to, Dr. Alfonso's treatment notes.

[9]  A GAF score between 51 and 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV 34.

1    mood and constricted affect, and she was assessed with a GAF score of 48.[10]  (*Id.* 429.)  On

2    August 19, 2010, plaintiff reported having increased mood swings, increased crying spells, and

3    increased irritability.  (*Id.* 428.)  On September 21, 2010, plaintiff made similar complaints --

4    increased mood swings, increased irritability, increased depression, and increased anxiety -- and

5    Dr. Alfonso wrote that plaintiff needs adjustments to her medication.  (*Id.* 427.)  On November

6    8, 2010, plaintiff again complained of depression and increased irritability.  (*Id.* 425.)  Dr. Alfonso

7    described plaintiff's recovery as "unstable" and adjusted her medications again.  (*Id.*)  On

8    November 16, 2010, plaintiff reported that her mood swings had decreased but her depression

9    and crying spells had increased.  (*Id.* 424.)  She also complained of low energy and lack of

10    motivation.  (*Id.*)  Dr. Alfonso again wrote that plaintiff's recovery was unstable and she needs

11    adjustments to her medications.  (*Id.*)

13        Thus, the objective medical evidence as a whole supports Dr. Alfonso's assessments of the

14    severity of plaintiff's impairments and her functional limitations.  The record shows that, although

15    plaintiff received mental health treatment over the course of several years and through multiple

16    institutions, she consistently exhibited a depressed mood and constricted affect and reported

17    anxiety, often coupled with paranoia and panic attacks, crying spells, mood swings, irritability, and

18    periods of self-isolation.  Consequently, the objective medical evidence did not support the ALJ's

19    decision to accord little weight to Dr. Alfonso's opinion.

21               **B.**      **The Frequency Of Plaintiff's Treatment**

23        The ALJ's second reason for assigning little weight to Dr. Alfonso's opinion was that the

24    frequency of plaintiff's visits to see Dr. Alfonso for treatment was inconsistent with Dr. Alfonso's

25    assessment of the severity of plaintiff's impairments and functional limitations.  (*See* A.R. 23.)

---

27       [10]  A GAF score between 41 and 50 denotes "[s]erious symptoms (e.g., suicidal ideation,

28  severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV 34.

1    Specifically, the ALJ noted that plaintiff "only saw" Dr. Alfonso every eight weeks.  (*Id.*)

2

3        In determining what weight to accord the opinion of the treating physician, the ALJ is

4    instructed to consider the length of the treatment relationship and frequency of examination

5    among other factors.   20 C.F.R. §§ 404.1527(c)(2)(I), 416.927(c)(2)(I).   "When the treating

6    source has seen [the plaintiff] a number of times and long enough to have obtained a longitudinal

7    picture of [her] impairment, [the Commissioner] will give the source's opinion more weight than

8    . . . if it were from a nontreating source."  *Id.*   Here, Dr. Alfonso saw plaintiff at least every eight

9    weeks over the course of two years and sometimes saw plaintiff on a monthly or even more

10   frequent basis.[11]  Accordingly, the length of Dr. Alfonso's treatment relationship with plaintiff and

11   frequency of plaintiff's appointments provided Dr. Alfonso with a unique longitudinal perspective

12   on plaintiff's impairments and her functional limitations, which strengthened the reliability of her

13   opinion relative to the opinions of Drs. Bagner and Malancharuvil.

14

15       The Court acknowledges that Dr. Malancharuvil intimated that the frequency of plaintiff's

16   treatment was not medically appropriate for an individual with the limitations Dr. Alfonso

17   assessed.  (*See* A.R. 68.)  However, Dr. Malancharuvil offered no explanation for his suggestion

18   that the frequency of plaintiff's treatment "does not make sense," and his conclusory opinion does

19   not constitute a specific and legitimate reason supported by substantial evidence for according

20   little weight to the opinion of plaintiff's treating psychiatrist.  *See* Garrison, 759 F.3d at 1012 (the

21   weight afforded a non-examining physician's testimony depends on the degree to which he

22   provided supporting explanations for his opinions); *see also* Lester, 81 F.3d at 831 ("The opinion

23   of a nonexamining physician cannot by itself constitute substantial evidence that justifies the

24   rejection of the opinion of . . . a treating physician.").  Accordingly, the frequency of plaintiff's

25   treatment with Dr. Alfonso did not support the ALJ's decision to accord greater weight to the

26   

27       [11] For example, plaintiff saw Dr. Alfonso in July, August, and September of 2010 (A.R. 427-29), twice in November 2010 (*id.* 424-25), and again in December 2010 (*id.* 423).  Plaintiff also

28   saw Dr. Alfonso monthly during the summer of 2011 (A.R. 470, 471, 472), and in the spring of 2012 (A.R. 420, 467).

opinions of Drs. Bagner and Malancharuvil than to the opinions of Dr. Alfonso.

### C.    Plaintiff's Daily Activities

The ALJ's third reason for assigning little weight to Dr. Alfonso's opinion was that Dr. Alfonso's assessment of plaintiff's functional limitations was inconsistent with plaintiff's daily activities, which included "maintaining her personal care," watching television, reading, helping with dishes, doing her laundry, sitting in the backyard, and playing with her grandson. (A.R. 23 (citing *id.* at 20).) However, the record shows that the ALJ did not fully consider the context of plaintiff's statements and that plaintiff's reported daily activities are not inconsistent with Dr. Alfonso's opinion.

Plaintiff testified that she showers once a week, because it's "too much" for her to do, "[i]t's just annoying . . . [and] I can't get my head to function on taking a shower." (A.R. 84.) She also testified:  the last time she drove was in 2002 (*id.* 81); she watches television but has trouble concentrating on the programs; she sits outside watching the kids play but goes inside the house if they start talking to her; she crochets; and even on good days, the farthest she ventures out of the house is to the backyard (*id.* 82-84).  These activities are not inconsistent with Dr. Alfonso's opinion that plaintiff would have difficulty working on a sustained basis or with her assessment that plaintiff experiences marked limitations in activities of daily living; experiences constant deficiencies in concentration, persistence, or pace; and would experience repeated episodes of "deterioration or decompensation in work or work-like settings." (*See id.* 444, 525.)  Accordingly, plaintiff's activities of daily living do not provide a specific and legitimate reason supported by substantial evidence for according little weight to Dr. Alfonso's opinion.

### D.    Plaintiff's Improvement

The ALJ's fourth reason for assigning little weight to Dr. Alfonso's opinion was that, in two

2012 treatment notes, plaintiff reported that her mental impairments were improving with medication. (A.R. 23 (citing *id.* 467, 520.)  Specifically, at her March 1, 2012 visit, plaintiff reported that she was "doing better and [feeling] less depressed." (A.R. 467.)  Plaintiff also reported that she continued to experience anxiety, and Dr. Alfonso noted that plaintiff exhibited a depressed mood and constricted affect and still suffered "depressive symptoms and mood swings." (*Id.*)  At her April 26, 2012 visit, plaintiff again reported that she was "doing better and [feeling] less depressed" but still experienced some anxiety. (*Id.* 520.)  Observing that plaintiff was "doing much better," although she continued to exhibit a depressed mood and constricted affect and to manifest "depressive symptoms and mood swings," Dr. Alfonso lowered the dosage of plaintiff's Celexa prescription. (*Id.*)  However, at plaintiff's next visit on June 21, 2012, plaintiff reported that she was "more anxious since her Celexa [dosage] was lowered" and was having "difficulty with the anxiety and can't stand it," which caused Dr. Alfonso to increase her Celexa. (*Id.* 519.)  At all three visits, Dr. Alfonso observed that plaintiff's mood was depressed and her affect constricted. (*Id.* 467, 519, 520.)

A claimant's mental health symptoms can be expected to "wax and wane in the course of treatment." Garrison, 759 F.3d at 1017.  Accordingly, "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an understanding of [the plaintiff's] overall well-being and the nature of her symptoms," and the fact "[t]hat a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *Id.* (citing Ryan, 528 F.3d at 1200-01); Holohan, 246 F.3d at 1205.  Here, the two treatment notes that the ALJ cited are not evidence that plaintiff's bipolar disorder, panic disorder, PTSD, and anxiety were effectively controlled by medication.  To the contrary, these treatment notes show that, despite the benefits of her medication regime, plaintiff continued to exhibit a depressed mood and constricted affect and to suffer anxiety, depressive symptoms, and mood swings.  Further, there is no evidence that the limited degree of improvement plaintiff did experience from her medication was inconsistent with Dr. Alfonso's assessment of plaintiff's limitations or with Dr. Alfonso's

1    opinion that plaintiff would have difficulty working on a sustained basis.  Accordingly, plaintiff's

2    limited improvement was not a specific and legitimate reason supported by substantial evidence

3    for assigning little weight to Dr. Alfonso's opinion.

4

5              **E.    Conclusion**

6

7              Dr. Alfonso's opinion regarding the severity of plaintiffs mental impairments and her

8    functional limitations was entitled to great weight under the Commissioner's own regulations and

9    could be rejected by the ALJ only if the ALJ articulated specific and legitimate reasons supported

10   by substantial evidence for doing so.  Here, however, the ALJ failed to identify legitimate reasons

11   supported by the record for assigning little weight to Dr. Alfonso's opinion.  Contrary to the ALJ's

12   assessment, Dr. Alfonso's opinion is overwhelmingly supported by the objective medical evidence

13   as a whole, which establishes that plaintiff:  is a survivor of child abuse and domestic violence;

14   has chronic PTSD, bipolar disorder, and panic disorder; has repeatedly been assessed GAF scores

15   in the low 50s and high 40s, indicating moderate to serious symptoms; consistently exhibits a

16   depressed mood and constricted affect; experiences anxiety, crying spells, mood swings, paranoia,

17   panic attacks, and bouts of debilitating depression; and has difficulty concentrating, performing

18   self-hygiene, and leaving the house.  The record further shows that plaintiff made every effort,

19   despite her impairments, to obtain regular treatment for her mental health problems and,

20   ultimately, established a longstanding treatment relationship with Dr. Alfonso, who met with

21   plaintiff on a bimonthly, and often more frequent, basis for at least two years.  Finally, although

22   plaintiff reported some improvement as a result of her medication regime, the record also shows

23   that plaintiff's depression, mood swings, and anxiety continued, and there is no indication that she

24   ever enjoyed a fully symptom-free day, much less a sustained period during which she would have

25   been capable of full-time work.  For these reasons, the ALJ erred in according little weight to Dr.

26   Alfonso's opinions and adopting the contrary opinions of the consultative psychiatric examiner, Dr.

27   Bagner, and the testifying medical expert, Dr. Malancharuvil.

28

### III.    Remand for Payment of Benefits Is Warranted.

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion.  Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Under the credit-as-true rule, a district court should remand for an award of benefits when the following three conditions are satisfied:  "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand."  Garrison, 759 F.3d at 1020.  The third of these conditions "incorporates . . . a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made."  *Id.* n.26; *see also* Harman, 211 F.3d at 1179-81 (where there are outstanding issues that must be resolved before a determination of disability can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated, remand is appropriate).

Here, all three conditions are satisfied:  (1) the record has been fully developed; (2) the ALJ failed to provide legally sufficient reasons for crediting the opinions of the medical expert and examining physician over the opinion of plaintiff's treating psychiatrist; and (3) if Dr. Alfonso's opinion was credited, plaintiff's impairments would satisfy the criteria for a listed impairment, thereby entitling her to a disability determination.  Further, after considering the record as a whole, the Court does not have "serious doubt" that plaintiff is, in fact, disabled.  *See* Garrison, 759 F.3d at 1021 (where "an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled," the court retains flexibility to remand for further proceedings even though all conditions of the credit-as-true rule are satisfied); *see also* Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003) (court has "some flexibility" in applying the credit-as-true rule when the ALJ's findings are so insufficient that the court cannot determine whether the rejected

testimony should be credited as true).   Dr. Alfonso opined that plaintiff's mental impairments cause her to experience marked limitations in activities of daily living and social functioning and constant limitations in concentration, persistence, and pace.  (A.R. 444, 525.)  This satisfies the paragraph B criteria for meeting listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders).  (*See* A.R. 18 ("To satisfy the 'paragraph B' criteria [for listings 12.04 and 12.06], the mental impairments must result in at least two of the following:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.").)  Dr. Alfonso's opinions are supported by both her own treatment records, which reflect a two-year treatment relationship with plaintiff, and plaintiff's mental health records from other institutions, and no conflicting assessment of the severity of plaintiff's mental limitations is consistent with the objective medical evidence as a whole.

Thus, the matter must be remanded to the ALJ for the calculation and award of benefits. To hold otherwise would subject plaintiff to the "'heads [the Commissioner] win[s]; tails, let's play again' system of disability benefits adjudication" that the credit-as-true rule is intended to prevent. *See* Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted).

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

**CONCLUSION**

Accordingly, for the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED, and this case is REMANDED to defendant for the payment of benefits to plaintiff.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

DATED: March 26, 2015

_Margaret A. Nagle_
MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE